**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. ____________

SOUTHSHORE RECOVERY ACQUISITION, LLC

Plaintiff,

v.

UNITED STATES OF AMERICA AND U.S. DEPARTMENT OF DEFENSE,

Defendants.

---

**COMPLAINT**

---

Southshore Recovery Acquisition, LLC ("Plaintiff"), by and through undersigned counsel, hereby files the following Complaint:

**STATEMENT OF THE CASE**

1. This is a civil action pursuant to Section 107 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("CERCLA"), 42 U.S.C. § 9607, and the Declaratory Judgment Act, 28 U.S.C. § 2201(a).

2. Plaintiff Southshore Recovery Acquisition, LLC, is the former owner of the Southshore Community Footprint Filing 19, Aurora, Colorado, also referred to by the property's address: 27230 E. Lakeview Dr., Aurora, Colorado 80016 ("the "Southshore Site"). The Southshore Site consists of roughly 105 acres located within the Former Lowry and Bombing and Gunnery Range ("FLBGR" or "Range") in Arapahoe County, Colorado. The Southshore Site is situated in the E/2 S28, T5S, R65W of the 6th P.M.

3. Plaintiff brings this action to recover damages from the United States of America and the U.S. Department of Defense (together, "Defendants") in the amount of necessary response costs incurred by Plaintiff in investigating and responding to releases and threatened releases of hazardous substances on the Southshore Site.

4. Plaintiff also seeks a declaration that Defendants are jointly and severally liable for all past and future costs incurred in investigating and responding to releases or threatened releases of hazardous substances on or from the Southshore Site.

**JURISDICTION AND VENUE**

5. This action arises under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a) and the Declaratory Judgment Act, 28 U.S.C. § 2201(a).

6. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, 42 U.S.C. §§ 9607(a) and 9613(b), and 28 U.S.C. §2201(a).

7. Venue lies in the District of Colorado pursuant to 28 U.S.C. §§ 1391(b), 1391(c), 1391(e), and 42 U.S.C. §§ 9607(a) and 9613(b) because the claims asserted arose in Colorado and the actual or threatened release of hazardous substances occurred and are occurring in this judicial district.

8. Defendants have waived any claim that they might have that this Court lacks jurisdiction over them for the resolution of the claims raised in this Complaint pursuant to Section 120(a)(1) of CERCLA, 42 U.S.C. § 9620(a)(1), and Section 6001 of the Solid Waste Disposal Act (also known as the Resource Conservation and Recovery Act ("RCRA")), 42 U.S.C. § 6961.

9. Defendants have also waived sovereign immunity under Section 120(a)(1) of CERCLA, 42 U.S.C. § 9620(a)(1), and Section 6001 of RCRA, 42 U.S.C. § 6961, for claims of

liability brought thereunder.

## PARTIES

10. Plaintiff is a Delaware limited liability company with its principal place of business in New York. Plaintiff's sole member is Paulson Property Management LLC ("Paulson PM").

11. Defendant United States of America is a sovereign nation, acting for itself, and by and through each and every department, agency, and instrumentality of the United States.

12. Defendant United States Department of Defense (the "Department") is a department of the United States government.

## BACKGROUND

### A. Defendants' Activities on the Southshore Site

13. The Range is located in Arapahoe County, Colorado, approximately 20 miles southeast of Denver, with portions located in or adjacent to Aurora, Colorado. From approximately 1942 until 1963, the United States, the Department, and/or one or more of the branches of the U.S. Armed Services (the "Services"), which are part of the Department and agencies or instrumentalities of the United States, owned or operated the Range and conducted bombing and armament training activities at the Southshore Site.

14. During operation of the Range, one or more of the Defendants maintained and operated seven bombing targets, a rocket and gunnery target, nine air-to-ground flexible gunnery targets, a nose and tail gun range (which was later replaced by an OQ range—a remote control target drone range), a jeep range, and three training camps on the Range. Additionally, one or more of the Defendants conducted napalm, practice bomb, photoflash bomb, and rocket and strafing missions on the Range. In fact, approximately 84 bombing missions were carried



52078928

out on the Range from July to December 1952.

15. Upon information and belief, the United States, the Department, and/or one or more of the Services began closing the Range in or around 1956 and sold or transferred the property to other persons or organizations between approximately 1960 and 1980.

16. The training activities conducted by one or more of the Defendants on the Range resulted in the discharge of military munitions, including unexploded ordnance ("UXO"), throughout the Range.

17. The military munitions discovered on the ground at the Range include small arms ammunition, 20 millimeter ("mm") cannon projectiles, 37 mm projectiles, 75 mm projectiles, practice bombs, rockets, fuzes, and other military munitions related materials.

18. The Southshore Site is comprised of roughly 90-acres of developable land adjacent to a housing community and an additional 15-acres south of the Aurora Reservoir in or adjacent to Aurora, Colorado.

19. The U.S. Army Corps of Engineers (the "Corps") has previously remediated munitions and explosives of concern ("MEC") and other munitions contamination (or reimbursed property owners for such remediation) at the Range on areas other than the Southshore Site.

20. A remedial investigation for MEC was conducted in the summer of 2020 on behalf of the Corps on the 105 acres of the Southshore Site. The military training area that appears to be the closest and most relevant to the Southshore Site is the southwestern corner of the Zone 5 of the 20 mm Range Fan, an area near the Southshore Site, in the vicinity of Aurora Reservoir. Military munitions, including 20 mm and 50-caliber rounds that were used for training maneuvers at the Jeep/Demolition Range, have been recovered in the military training

area of concern. Until the time of remediation, the Southshore Site had otherwise remained vacant. and zoned residential.

21. The Southshore Site is zoned residential. Development of residential subdivisions in the surrounding area began in the early 2000s.

**B. <u>Plaintiff's Purchase of the Southshore Site</u>**

22. An entity related to Plaintiff purchased the Southshore Site in 2009. At that same time, the related entity purchased an additional 352 acres previously remediated by a prior owner/lender ("Additional Southshore Parcels"), and the right to all cost recovery and other claims arising from the cleanup costs associated with the Additional Southshore Parcels. The related entity transferred the Southshore Site and the Additional Southshore Parcels to Plaintiff in 2011.

23. Public information about the Southshore Site, including the Corps' Management Plan for the Range, did not place the Southshore Site in a designated known "area of concern" ("AOC"), areas considered by the Corps as those on the Range with known contamination. The 1963 Final Range Clearance Report also indicated that land areas outside of designated AOCs presented "no significant risk" to a change in land use.

**C. <u>Plaintiff's Response Action on the Southshore Site</u>**

24. After purchasing the Southshore Site, Plaintiff discovered the extent of the threat of UXO and other military munitions on the Southshore Site caused by the training activities on the Range.

25. Plaintiff did not cause or contribute in any way to the release of military munitions on the Southshore Site.

26. The area west and south of the Southshore Site, including other land located on the

FLBGR, is primarily developed as residential property, including single-family homes.

27. Plaintiff desired the Southshore Site be utilized for its highest and best use and, to that end, filed a plat titled Southshore at Aurora Subdivision Filing No. 19 to subdivide the Site for residential development, which was approved by the City of Aurora on June 10, 2020. (*See* Arapahoe County Reception No. E0083044, recorded July 8, 2020).

28. To further use the Southshore Site for its highest and best use, after the cleanup, Plaintiff sold the Southshore Site to Richmond American Homes of Colorado, Inc., for residential development consistent with the surrounding area on August 26, 2020. (*See* Arapahoe County Reception No. E0111713, recorded Aug. 27, 2020.)

29. Prior to that sale, the State of Colorado Department of Public Health and Environment ("CDPHE") and the City of Aurora, the municipality with land use authority over the Southshore Site, required Plaintiff to significantly reduce the risk associated with a release or threatened release of military munitions and other hazardous substances on the Southshore Site prior to beginning any development activities on the Southshore Site.

30. Plaintiff retained Tetra Tech, Inc. ("Tetra Tech"), an environmental consulting company, engineering, and remediation firm with over 26-years of experience in the clean-up of military munitions contamination, to investigate and remove MEC from the Southshore Site. The selection of Tetra Tech was based on their experience working both at the Range and throughout the State of Colorado on munitions investigation and remedial actions.

31. Tetra Tech began its initial investigation on the Southshore Site in March 2020.

32. As required by CDPHE, Tetra Tech submitted to CDPHE an Integrative Corrective Action Plan ("ICAP"), which detailed the remedy and methodology selected to remove MEC from the Southshore Site.

33. After revaluating remedial alternatives and past Range operations, the Tetra Tech's ICAP presented a removal action as the appropriate response to contamination on the Southshore Site with the goal of removing, to the maximum extent possible using current technology and procedures, all UXO and discarded military munitions ("DMM") of 20 mm diameter or greater based on the predicted maximum reliable detection depths for expected munitions.

34. Moreover, the stated purpose of the ICAP was to facilitate a commercial Munitions Response ("MR") action to address the potential for explosive-related hazards at the construction footprint of the Southshore Site.

35. Tetra Tech also proposed removing MEC and Material Potentially Presenting an Explosive Hazard ("MPPEH") of 2 inches by 2 inches from the surface and shallow subsurface, and remove ferrous metal greater than 2.75 inches in diameter or greater to a depth of eight inches. It also recommended to pursue source to depth of detection or until an obstruction was encountered within a radius of 3.3 feet or as otherwise stipulated on dig sheets.

36. CDPHE approved the final ICAP for Southshore Site on April 8, 2020, including the purpose and associated clearance standard proposed in the ICAP.

37. The removal remedy and clearance standard in the ICAP is substantially consistent with clean-up requirements set forth in CERCLA, 42 U.S.C. §§ 9601, *et seq.,* including National Contingency Plan ("NCP") requirements applicable to private party response actions under CERCLA (40 C.F.R. § 300.700(c)(2)), and at least as rigorous as the remedy and standard used by the Corps in its removal of military munitions on the rest of the Range.

38. Discussions were held with the City of Aurora about the investigation at the Southshore Site.

39. The ICAP was provided to the Corps' point of contact for review and comment.

40. Tetra Tech performed the response action across the Southshore Site in accordance with the ICAP. Quality control measures were also implemented in accordance with the ICAP to ensure quality throughout all tasks performed under the ICAP and to provide added confidence in the usability of the data gathered at the Southshore Site.

41. Tetra Tech completed removal activities on the Southshore Site on or about August 7, 2020.

42. The intrusive investigation of the 5,739 targets included a total of 274 Materials Documented As Safe ("MDAS"), including two 20mm training practice rounds, one 2.75-inch rocket warhead, one M46 PD Fuze, plus over 424 pounds of .50 caliber small arms ammunition, one M1907M PTTF, and 66 2.75-inch rocket debris. All MDAS was verified as free of explosive hazards, placed into two fifty-five-gallon drums, sealed, and labeled. The materials were managed in substantive compliance Department of Defense Manual 4140.72 "Management of Material Potentially Presenting an Explosive Hazard" and the drums transported off site to Demil Metals in Texarkana, Arkansas for processing and final destruction.

43. The investigation of the identified targets was necessary to meet the objective of the ICAP and to reduce the risk of explosive hazards to human health and minimize the potential for human interaction with MEC (including UXO) to a state-accepted threshold.

44. There is no method of distinguishing between live and inert ordnances when they are in the ground; they can only be classified once they are removed and examined. For this reason, Plaintiff was required to remove both live and practice/training material from the Southshore Site to address the threat of a release of MEC at the Southshore Site.

45. In accordance with the ICAP, Tetra Tech prepared a closure report, known as a

"Site Specific Final Report" or "SSFR," summarizing its work on the Southshore Site and documenting Plaintiff's compliance with the NCP removal action requirements.

46. The Corps reviewed the draft SSFR and final SSFR.

47. CDPHE approved the final version of the Site-Specific Final Report for the Southshore Site on August 12, 2020.

48. The investigation and cleanup pursuant to the SSRF cost Plaintiff approximately $701,459.

**FIRST CLAIM FOR RELIEF**
**(Cost Recovery under CERCLA)**

49. Plaintiff repeats the allegations of paragraphs 1 through 48, inclusive, as if set forth fully herein.

50. CERCLA § 107(a)(2) and (a)(4)(B), together, provide that "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substance were disposed of . . . shall be liable for . . . (B) any other necessary costs of response incurred by any other person consistent with the national contingency plan . . . ." 42 U.S.C. § 9607(a)(2) & (a)(4)(B).

51. Defendants are "persons" as defined in Section 101(21) of CERCLA, 42 U.S.C. § 9601(21). The Southshore Site is a "facility" as defined by Section 101(9) of CERCLA, as one or more of the Defendants deposited, stored, disposed of and placed military munitions on the Southshore Site during the time that the Defendants owned and/or operated the Range.

52. Military munitions that have been abandoned or remain on a military range after the range has been closed are characteristic hazardous wastes under RCRA, 42 U.S.C. § 6921, and, therefore, constitute hazardous substances as defined in Section 101(14) of CERCLA, 42 U.S.C. § 9601(14).

53. Defendants "disposed of" hazardous substances at the Southshore Site, including military munitions, through the discharge, deposit, or placement of military munitions on the Southshore Site and then subsequent abandonment of military munitions on the Southshore Site.

54. There was a release and threat of release of hazardous substances, as defined in Section 101(22) of CERCLA, on the Southshore Site during the time the Southshore Site was owned and/or operated by the Defendants, as a result of one or more of the Defendants' use of military munitions on the Southshore Site and in close proximity of the Southshore Site, onsite disposal of military munitions on the Southshore Site, and abandonment of military munitions on the Southshore Site.

55. As a result of the disposal and release of hazardous substances on the Southshore Site, and the ongoing threat of release of munitions at the Southshore Site, Plaintiff incurred necessary costs of response that are consistent with all applicable requirements of the NCP, including, without limitation, costs of investigation and monitoring the Southshore Site, costs of removing military munitions and other contaminants from the Southshore Site, and technical consultants' fees.

56. As persons who owned and operated the Southshore Site at the time of the disposal of hazardous substances at the Southshore Site, Defendants are liable under Section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2), for the necessary costs of response consistent with the NCP that Plaintiff has incurred as a result of the release, and threat of release, of hazardous substances at the Southshore Site.

57. Plaintiff did not in any way contribute to the release of military munitions on the Southshore Site.

58. Plaintiff has incurred over $701,459 in munitions response costs to address the

presence of military munitions on the Southshore Site.

**<u>SECOND CLAIM FOR RELIEF</u>**
**(Declaratory Judgment)**

59. Plaintiff repeats the allegations of paragraphs 1 through 58, inclusive, as if set forth fully herein.

60. Plaintiff may continue to incur response costs to address the release of military munitions on the Southshore Site as a result of the Defendants' activities on the Site and the associated release and threat of release of hazardous substances on the Site.

61. The Declaratory Judgment Act, 28 U.S.C. § 2201(a), provides that the Court may issue a declaratory judgment in a case of actual controversy within its jurisdiction.

62. For the reasons stated above, Plaintiff is entitled to a declaration that Defendants are jointly and severally liable under CERCLA §107(a) for not only response costs incurred to date, but also future response costs they incur to address the release of hazardous substances at the Southshore Site.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that this Court:

A. Enter judgment in favor of Plaintiff and against the Defendants with respect to Plaintiff's claims;

B. Order Defendants to pay Plaintiff's response costs, as provided in 42 U.S.C. § 9607 (with interest thereon from the date of expenditure);

C. Declare Defendants are jointly and severally liable to Plaintiff for any and all future necessary costs of response action activities which Plaintiff has been or may be required to undertake at the Southshore Site to date and in the future; and

D. Award such other and further relief which this Court deems just and equitable.

Dated October 26, 2026.

Respectfully submitted,

BROWNSTEIN HYATT FARBER SCHRECK LLP

By: /s/ Michelle C. DeVoe
Michelle C. DeVoe, # 35223
675 15th Street, Suite 2900
Denver, CO 80202
303-223-1238
MDevoe@bhfs.com

*Attorneys for Plaintiff*

Plaintiff's Address:
Southshore Recovery Acquisition, LLC
1166 Avenue of Americas, 50th Floor
New York, New York 10036